## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Christine P. O'Hearn, U.S.D.J. |
| | : | |
| v. | : | |
| | : | |
| ZACHARY WILLIAMS | : | Criminal No. 22-325 (CPO) |

## THE UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33

Following a three-week trial which included testimony from thirteen witnesses, a jury found the defendant Zachary Williams guilty of all Counts in the Indictment: Counts 1 and 2—travel to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); Count 3—sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a); Count 4—coercion and enticement, in violation of 18 U.S.C. § 2422(b); and Count 5—possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). In preparation for sentencing, the United States realized it had erroneously instructed Williams on the maximum penalties for Count 4. Recognizing that the Government's error was carried into the Court's *Faretta* colloquies on March 24, 2023 and June 25, 2024, the Government notified the Court and defense of the error by letter dated January 27, 2025, and agreed to waive the two-week time limit for filing a motion for a new trial pursuant to the Rule 33 of the Federal Rules of Criminal Procedure. *See* Docket Entry ("DE") 291.

Relying primarily on *United States v. Booker*, 684 F.3d 421, 425–29 (3d Cir. 2012), the defendant filed a motion for a new trial pursuant to Rule 33 alleging that

because he was misadvised on the maximum penalties of the Count 4 offense, his Sixth Amendment waivers of counsel were invalid, and he is entitled to a new trial. DE296-1.

A careful examination of the Court's *Faretta* colloquies, however, shows that despite the error on the Count 4 penalties, the Court adequately advised of Williams of the "range of possible punishments" he faced if convicted at trial. Specifically, the Court informed Williams that he faced a similar mandatory minimum term of imprisonment on the Count 3 offense (15 rather than 10 years), and that he faced a potential aggregate sentence of up to 120 years of imprisonment—a period which is significantly longer than the remainder of Williams' natural life, thereby effectively informing Williams that he could spend the rest of his life in prison. Beyond the colloquies, the rest of the record—which the Third Circuit has permitted courts to consider in evaluating the validity of a Sixth Amendment waiver in some cases— further supports a finding that Williams knew and acknowledged the "range of possible punishments" he faced at trial. Given that knowledge, Williams' waiver of his right to counsel was knowingly and intelligently entered, and his motion for a new trial should be denied.

## I.    Relevant Facts

After a series of disputes with his second attorney, Mark W. Catanzaro, Esquire, Williams sought to represent himself *pro se*. In preparation for the waiver hearing, the Government wrote a letter dated March 21, 2023 containing a proposed *Faretta* colloquy (Exhibit 1). In its letter, the Government described each of the

charged offenses, their elements and the statutory maximum penalties. Unfortunately, the Government erred in stating the statutory penalty for the Count 4 offense.[1] This mistake resulted in the Court erroneously advising Mr. Williams during his March 24, 2023 *Faretta* colloquy that he faced a 10-year maximum term of imprisonment on Count 4, instead of a maximum of life imprisonment and a mandatory minimum of 10 year's imprisonment. DE58 at 21 (first *Faretta* colloquy). Similar mistakes occurred during Williams' second *Faretta* colloquy on June 25, 2024, and during his arraignments on May 11, 2022 and March 11, 2024. *See* DE197 at 24 (second *Faretta* colloquy); DE286 at 4; DE124 at 58. The Government deeply regrets these mistakes and apologizes to the Court, Williams and counsel for them.

This court engaged in a thorough *Faretta* colloquy with Williams on March 24, 2023, which included the following instructions on the potential penalties faced by Williams upon conviction:

> THE COURT: Mr. Williams, I am going to ask you, and I want to make sure that you understand, if you are found guilty of the charged offenses, the Court could sentence you as follows for each count: **Count 1, up to 30 years' imprisonment** and a minimum of five years' supervised release up to a lifetime of supervised release. Do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: **Count 2, up to 30 years' imprisonment** and a minimum of five years up to a life term of supervised release. Do you understand that?

---

[1] Attachment A to the March 21, 2023 letter did quote 18 U.S.C. § 2422(b) verbatim on page 3, including that anyone convicted of violating it "shall be fined under this title and imprisoned ***not less than 10 years or for life***" (emphasis added). But regrettably, Attachment A also stated incorrectly on page 4 that the maximum term of imprisonment for Count 4 was 10 years. So did, regrettably, defense counsel's March 23, 2023 letter to the Court. *See* DE56, at 3.

THE DEFENDANT: Yes.

THE COURT: **On Count 3, a 15-year mandatory minimum sentence, maximum of 30 years' imprisonment** with a minimum term of five years up to a life term of supervised release. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. **Do you also understand, however, if you have one prior conviction, under that same statutory section or under the laws of any state relating to aggravated sexual assault, sexual abuse -- I'm sorry, aggravated sexual abuse, sexual abuse, abusive sexual conduct involving a minor or ward, or sex trafficking of children or the production, possession, receipt, mailing, distribution, sale, shipment, or transportation of child pornography, the imprisonment term minimum would be 25 years and no more than 50 years**; **with two prior convictions for the same related conduct, then the minimum would be 35 years and no more than life?** And while, as you heard Ms. Carrig say, we are not aware that you presently have any convictions, you understand that you have other matters pending, correct?

THE DEFENDANT: Yes. And do other matters -- would pertain to that still under the law?

THE COURT: I can't give you legal advice but what I can tell you is out of an abundance of caution, **while it's my intent to try you in this courthouse in this case first, if, by some chance, something would change and you were tried and convicted in one of the other matters first, the government may then argue that the enhanced maximum or minimum penalties would apply. Therefore, I am reading that to you to make sure that you understand that that's a risk. Do you understand that?**

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Is that sufficient, Ms. Carrig?

MS. CARRIG: Yes, Your Honor.

THE COURT: **Count 4, you could be sentenced up to ten years in prison** with a minimum of five years up to a life term of supervised release. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And **Count 5, you could be sentenced up to 20 years in prison** with a minimum term of five years up to a lifetime term of supervised release. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And just as I have just read to you for the prior Count 3, in Count 5 there would be the **same enhanced penalties if, in fact, you had a prior conviction, prior to the time of sentencing in this case, which would increase the penalties to a minimum of ten years and not more than 20 years**. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Ms. Carrig, was that sufficient?

MS. CARRIG: Yes, Your Honor. Thank you.

　　　*　　*　　*　　*

THE COURT: **Do you understand if you're convicted of any of the charges in the indictment, the Court could order the sentences to run consecutive to each other, that is, one after the other?**

THE DEFENDANT: Yes, Your Honor.

DE58 at 19-22 (emphasis added). Having just advised Williams of the statutory maximum penalties for each count (albeit incorrectly for Count 4), Williams should have realized that he faced a maximum possible term of imprisonment of each of the statutory maximums: 30 + 30 + 30 + 10 + 20 = 120 years.

Thereafter, at various conferences and hearings this court routinely asked Williams if he wanted to continue to proceed *pro se,* and informed him that if he

wished to revoke his *pro se* status he could do so at any time. Each time Williams responded that he wanted to remain *pro se*. *See, e.g.,* Transcript of June 1, 2023 Status Conference, DE150 at 11-12; Transcript of August 1, 2023 Status Conference, DE152 at 14; Transcript of September 8, 2023 *Frye* Colloquy, DE153 at 26-27; Transcript of October 27, 2023 Status Conference, DE159 at 22; *see also* December 20, 2023 Status Conference, DE156 at 20 (Court stopped asking Williams if he wanted to be pro se "because that's what you've assured me you wanted to do")..

On February 14, 2024, Williams' standby counsel filed a motion to be relieved as standby counsel, explaining that his relationship with Williams had broken down to the point that he could no longer represent Williams, who had demeaned him in "an expletive laced tirade." DE113-1.

On March 11, 2024, the Court held a hearing on Mr. Catanzaro's motion to be relieved, as well as various other pending motions. While questioning Williams about his failure to respond to the Government's pretrial motions, Williams claimed he was in over his head and—after flip-flopping multiple times, ultimately said he no longer wished to proceed *pro se*. March 11, 2024 Transcript, DE124 at 39-40, 43, 51-52. The Court denied Mr. Catanzaro's motion to be relieved, and reappointed him as counsel. The court raised its concerns—and not for the first time—that Williams was engaging in gamesmanship and dilatory tactics.. *Id.* at 40-41.43-44.

While representing Williams, Mr. Catanzaro filed pretrial motions, responded to the Government's pretrial motions, met with the Government to review exhibits and began trial preparation. On June 4 and 6, 2024, the Court held hearings on the

motions and ruled that, if triggered at trial, the Government could introduce evidence of Williams's statements to agents during his proffers with the Government in October and November 2022. DE173.

In mid-June 2024, Williams filed letters complaining that his counsel did not have his best interest at heart, and that the court was biased against him. DE184,& DE185. At a hearing on June 25, 2024, the court denied Williams' motions, after which Williams requested a new attorney. When the court rejected his request, he once again invoked his right to represent himself *pro se*. June 25, 2024 Transcript, DE197 at 10-11. The court engaged in a *Faretta* colloquy with Williams similar to the first colloquy. DE197 at 23-25.

Following that colloquy, the Court initially denied Williams' request to represent himself, *id.* at 24-36. But after reconsideration, and reassurances by Williams that he would be ready to proceed at trial without delay, the court granted his motion to represent himself. June 28, 2024 Transcript, DE240 at 11-12. Again, the court repeatedly informed Williams that he could revoke his *pro se* status at any time: "I want to make sure you understand that any time during the trial if you decide you no longer want to be *pro se* and you want Mr. Catanzaro to step in as counsel, you can ask to speak to me and tell me that." *See, e.g., id.* at 19.

And that is what Williams did. After all of the Government's witnesses had testified and Williams had an opportunity to cross-examine them, he revoked his *pro se* status, and Mr. Catanzaro stepped in to deliver the defendant's closing argument and finish the trial.

**Williams' Two Other Cases Pending in Connecticut and New York**

In addition to his New Jersey case, Williams has two similar pending child sexual abuse cases, one in the District of Connecticut, Crim. No. 3:22CR83 (SVN), and the other in the Eastern District of New York, Crim. No. 22-449 (FB). In each of those cases, Williams is charged with coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b)—the same offense charged in Count 4 here. Williams has sought to represent himself in those cases, too, and, on September 29, 2023, waived his right to counsel in the District of Connecticut after engaging in a *Faretta* colloquy (Exhibit 2).

During the District of Connecticut colloquy, the court engaged in the following exchange with Williams, pertaining to his knowledge of the statutory maximum penalties he faced there:

> THE COURT: Actually, you know what, Mr. Williams. Could I ask you to put the Indictment aside for a second. I don't want you to read it to me. What I want to know is whether you genuinely understand what you've been charged with here.
>
> THE DEFENDANT: I believe that I had crossed state lines to have sex with somebody under the age of 12.
>
> THE COURT: Okay.
>
> THE DEFENDANT: And that there was production of images of like the contact on two separate occasions. And that's all I believe that I think the Indictment entails, the accusations.
>
> THE COURT: Well, there's a Count Two. But you're right that the first two counts in the Indictment you've been charged with Aggravated Sexual Abuse with Children, of a child less than 12 years old, in violation of 18, United States Code, 2241(c). Are you familiar with the penalties that could be imposed if you were to be convicted of that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. What's your understanding of that?

THE DEFENDANT: That it's 30 years to life in prison.

THE COURT: You understand it's what we call the mandatory minimum, right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And do you understand what kind of fines could be imposed, what kind of supervised release and all that? Do you understand that?

THE DEFENDANT: I understand that fines and things like that could be imposed.

THE COURT: Okay. So, for example, if you were to be convicted of Count One or Count Two of the Indictment, you could face a mandatory minimum of 30 years. You could face a maximum term of life in prison. You could be fined as much as $250,000. And if there was an end to the term of imprisonment, after the term of imprisonment you could be placed on a term of supervised release for five years and up to life. And then there would also be what we call a special assessment. Do you understand all of that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You've also been charged with Production of Child Pornography, in violation of 18, United States Code, 2251(a)(1). Are you familiar with what penalties could be imposed there?

THE DEFENDANT: Yes, Your Honor.

THE COURT: What's your understanding there?

THE DEFENDANT: That I believe it's 15 to 30.

THE COURT: Okay.

THE DEFENDANT: Or 20.

MR. WILLSON: No, 30.

THE DEFENDANT: I did it right.

THE COURT: Okay. And, Mr. Williams, you're certainly entitled to ask Mr. Willson anything you want to ask him. And if you need to do that privately, we'll give you as much time as you need here. But one thing I'm trying to figure out is what you know because you're proposing to represent yourself here. In a minute I'm going to ask you a question about whether you want him as your standby counsel or whether you want him out of the picture entirely. But either way, you know, what this is going to be about here is what you know and your own ability to represent yourself. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. All right. So with respect to the child pornography charge, you understand if you're convicted there's a mandatory minimum term of imprisonment of 15 years. There's a 30 year maximum. You could be fined $250,000. Supervised release term of five years to life. And there's also a special assessment. Do you understand all of that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. And then there's another charge in the Indictment, Mr. Williams. And without looking at the Indictment, I just want to know if you know what it is.

THE DEFENDANT: I don't remember. I don't recall.

THE COURT: Okay. Mr. Williams, if I were to tell you you've been charged with Coercion and Enticement, in violation of 18, United States Code, 2422(b), would that be familiar to you?

THE DEFENDANT: Oh, okay. Yes.

THE COURT: Okay. So you've heard before that you've been charged with that?

THE DEFENDANT: Yes.

THE COURT: And are you familiar with what penalties could be imposed on that count?

10

THE DEFENDANT: I'm familiar, but I don't recall at this moment.

THE COURT: Okay. All right. I think we went over this at your arraignment, Mr. Williams. Do you understand that under that count you could face -- if you were to be convicted, there's a mandatory minimum term of imprisonment of 10 years. There's a maximum of life. A supervised release term of five years to life. And also a mandatory special assessment. Do you understand all of that?

THE DEFENDANT: Yes, Your Honor.

       *    *    *    *

THE COURT: Okay. All right. So tell me what you think the advantages are of self-representation in your case.

THE DEFENDANT: The advantages of self-representation might include being able to have more of an in-depth scope of the charges, the discovery. More inside information about the case. How to better fight it. How to better formulate a defense that maybe a lawyer wouldn't be able to see because, I mean, you are the person that was living through the situation or, you know, would be able to find out more stuff, you know, instead of like your lawyer who has to look through 100,000 pages, you know, and they didn't live the situation.

       *    *    *    *

THE COURT: . . . . But, you know, if what's down at the bottom of it here is just you don't think this particular representation has been going well, you know, you do have the right to ask for other counsel. Mr. Willson will probably be the first person to tell you that it's happened before and he won't be personally offended if you were to do that. With all of that said, Mr. Williams, what's your thinking here? Do you think you might want another lawyer or do you think you want to represent yourself because you think you'd be the best person to represent you?

THE DEFENDANT: I think I would definitely represent myself. I think I'm the best person to represent myself at this point in time.

THE COURT: Okay. I just want to make sure you understand, most people who make that calculation, it does turn out to be wrong, you know. Because, again, your lawyer, you know, he has a law degree. He's really studied the Rules of Criminal Procedure, the Rules of Evidence

and so forth. But even so, you want -- you think you're the best guy to represent yourself and you want to go ahead and do it?

THE DEFENDANT: Yes, Your Honor.

Exhibit 2 at 12-16, 31 & 37. After being permitted to represent himself in the District of Connecticut, Williams has flip-flopped with respect to his representation multiple times:

- 12.15.2024—The court revoked Williams' *pro se* status at his request;

- 1.2.2024—The court granted Williams' motion to resume *pro se* representation;

- 3.26.2024—The court revoked Williams' *pro se* status at his request; and

- Currently pending before the court is another motion by Williams to resume his *pro se* representation, which the court has scheduled to be addressed at a status conference on April 9, 2025.

## II.    This Court Should Decide Williams's Motion on the Merits

Although Rule 33 of the Federal Rules of Criminal Procedure requires a defendant to file a motion for a new trial within two weeks of the jury's verdict, the Government has waived this time limit in this case due to its error. Given that waiver, this Court should resolve the motion on the merits. The 14-day deadline under Rule 33(b)(2) is a "claims-processing" rule that is "non jurisdictional." *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam). The Government therefore can waive or forfeit. *Id.* And when the Government does waive it, the court should proceed to the merits. *Id.*; *see Wood v. Milyard*, 566 U.S. 463, 473–74 (2012).

### III.    Waiver of Right to Counsel Under the Sixth Amendment

To be effective, a defendant's waiver of his Sixth Amendment right to counsel must be "'knowing[] and intelligent[].'" *Faretta v. California*, 422 U.S. 806, 835 (1975). The trial court bears the "serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused" based on the "particular facts and circumstances surrounding th[e] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938). And given the seriousness of the rights at stake, courts "must 'indulge every reasonable presumption against waiver'" of the right to counsel, *Boyd* v. *Dutton,* 405 U.S. 1, 3 (1972) (quoting *Johnson,* 304 U.S. at 464).

### A.    Third Circuit's Requirements for 6th Amendment Waiver

The Third Circuit requires district courts to conduct on-the-record colloquies with defendants to determine whether they knowingly and voluntarily wish to waive their right to counsel. *See United States* v. *Peppers,* 302 F.3d 120, 135-137 (3d Cir. 2002); *United States* v. *Jones,* 452 F.3d 223, 228-229 (3d Cir. 2006). While the Court encourages the use of a model colloquy contained in the Federal Judicial Center's *Benchbook for U.S. District Court Judges,* it does not require slavish adherence to any particular script. *See Jones,* 452 F.3d at 234 & n.8 ("no scripted recital is required" and a district court need not "explain factors that are irrelevant to a defendant's circumstances"); *Peppers,* 302 F.3d at 135 ("there is no talismanic formula for the court's inquiry"). This is consistent with Supreme Court precedent, which

provides that "a waiver of counsel [i]s intelligent when the defendant 'knows what he is doing and his choice is made with eyes open.'" *Iowa v. Tovar,* 541 U.S. 77, 81, 92 (quotation omitted).

Synthesis of the Third Circuit's jurisprudence pertaining to a defendant's assertion of the right to self-representation reveals that four requirements must exist before the Court may permit a defendant to proceed *pro se.* They are:

1.    The defendant's assertion must be clear and unequivocal, *Peppers*, 302 F.3d at 132; *Buhl v. Cooksey*, 233 F.3d 783, 791 (3d Cir. 2000);

2.    The Court must inquire thoroughly to satisfy itself that the defendant understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved, *Peppers*, 302 F.3d at 132;

3.    The Court must assure itself that the defendant is competent to stand trial, *Peppers*, 302 F.3d at 132; and

4.    The request must be timely, and, in cases where the request to represent oneself is made on the eve of trial, or during trial, the Court must ascertain the defendant's reasons for the dissatisfaction with counsel, *Peppers*, 302 F.3d at 132-33; *Buhl*, 233 F.3d at 798.

When a waiver is found to be ineffective, that is, not knowing and voluntary, there is no harmless error review. The error is considered

"structural," and the conviction must be vacated, and the case remanded for a new trial. *Jones*, 452 F.3d at 230. Because of the dual and conflicting Sixth Amendment rights—the right to counsel and the right to represent oneself—such waivers are fraught with risk for district courts and have resulted in highly fact-based and seemingly conflicting decisions. *Cf. United States v. Taylor*, 21 F.4th 94, 105 (3d Cir. 2021) ("Indeed, whenever a defendant invokes his right to self-representation, a district court risks violating the defendant's constitutional rights whether or not it permits the defendant to proceed *pro se*.").

### B.    Third Circuit Cases in which Errors or Omissions Occurred in Instructing Defendants About Penalties

Because Williams' motion is based solely on misstatement of penalties for the Count 4 offense, the Government has focused its analysis on cases in which the colloquies were silent on or contained an error in the range of punishments.

In *United States v. Booker*, the Third Circuit addressed the validity of a waiver that contained a materially flawed recitation of the range of punishments but was otherwise sufficient. 684 F.3d at 425–29 (""[T]he District Court seemed to address all of the relevant factors to establish a proper waiver."). There, the Court held that where the district court fails to "state the range of possible punishments" in the *Faretta* colloquy, a defendant's waiver of counsel is "not voluntary and knowing," and gives rise to a structural error which requires a retrial. *Id.* at 425–29. In *Booker*, the

district court made multiple "significant" errors which resulted in a substantial understating of the penalties the defendant faced at trial, including:

- understating by ***20 years*** the mandatory minimum term of imprisonment for Booker's 18 U.S.C. § 924(c) charge;

- failing to advise Booker that the maximum term of imprisonment for that offense was life; and

- misadvising Booker that the term of imprisonment for the § 924(c) offense could run concurrently or consecutively when it could ***only*** run consecutively to any other term of imprisonment that Booker received.

*Id.* at 427. Thus, the district court failed to advise Booker before he waived his right to counsel that, were he convicted of all counts at trial, he would have to serve 25 years' to life imprisonment on the § 924(c) count ***consecutively*** to any term of imprisonment he received on the other counts. *Id.* at 428. The Third Circuit found that such a material misstatement of the potential punishments rendered Booker's waiver of counsel invalid.

Although *Booker* limited its waiver analysis to the actual colloquy and declined to consider the rest of the record, *id.* at 428, other Third Circuit cases have considered the record as a whole in affirming a defendant's Sixth Amendment waiver. For example, in *United States v. McFadden*, 630 F.2d 963 (3d Cir. 1980), the Court of Appeals considered a defendant's gamesmanship in upholding a waiver that was entered on the eve of trial where the defendant was engaged in dilatory tactics, refused to consent to a

continuance, refused to accept his lawyers' advice and had threatened to sue his two prior lawyers. *Id.* at 964, 967-973. Although the district court did not warn McFadden of the potential penalties during his *Faretta* colloquy, relying on prior appearances before a Magistrate Judge at which the penalties were announced, the Court still enforced the waiver. *Id.* at 972. While recognizing this was a close case, the court looked outside of the confines of the *Faretta* colloquy to find a valid waiver: "Certainly McFadden was not entitled to employ complaints against counsel as a dilatory tactic in order to postpone trial, raise a Speedy Trial Act claim, or await possible death or unavailability of prosecution witnesses, a course unquestionably suggested by the record of McFadden's conduct." *Id.*

Similarly, in *United States v. Moskovits*, 86 F.3d 1303, (3d Cir. 1996), the Court of Appeals upheld a waiver where the otherwise thorough *Faretta* did not on its face adequately cover potential punishment. *Id.* at 1306-09. Looking to the record outside the colloquy to determine the defendant's knowledge of potential penalties, the Circuit affirmed the conviction (and the validity of the waiver) but remanded the case for resentencing with a 15-year cap on the sentence because 15 years was the highest possible sentence that the defendant was aware that he could face based upon a review of the record. *Id.*

Likewise, in *McCollister v. Cameron*, 535 F. App'x 187 (3d Cir. 2013) (non-precedential), the Court of Appeals affirmed the district court's denial of a state habeas petition challenging the adequacy of a waiver of counsel where

a defendant was not informed that he faced increased penalties under Pennsylvania's "three strikes" law. *Id.* at 191-92.[2] Specifically, the defendant was informed at trial that he faced an "an aggregate prison range of 40 to 80 years in prison" but learned only after his conviction that his range of punishments was expanded to impose a 25 mandatory minimum sentence and a maximum of life. *Id.* In affirming the denial of relief, the Court noted that "[while] not informed that the maximum prison term could be life, this omission was inconsequential in view of McCollister's age at the time of the plea colloquy (39-years-old)" and the fact that McCollister was advised that he faced a range of 40 to 80 years. *Id.*

Even where the Court of Appeals has vacated convictions based on errors in the *Faretta* colloquies (which cases are largely fact-specific), the Court has engaged in some analysis of the underlying record in considering the validity of the colloquies. For example, in *United States v. Stubbs*, 281 F.3d 109 (3d Cir. 2002), although the Third Circuit reversed and remanded after finding an inadequate waiver on multiple issues, it noted that failure to

---

[2] Because *McCollister* is a state habeas case, the defendant could prevail under 28 U.S.C. § 2254(d)(1) only by showing the state court's rejection of his claim "was contrary to or involved in an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." *Id.* at 191. In rejecting McCollister's reliance on *Booker*, 684 F.3d 421, *Jones*, 452 F.3d 223, and *Moskovits,* 86 F.3d 1303, the Court of Appeals noted that those decisions "cannot 'be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced'" where "the Supreme Court has not held that the omission of information pertaining to a statutory mandatory minimum or an inconsequential error with respect to the maximum prison term voids an otherwise effective waiver of counsel." *McCollister*, 535 F. App'x at 192.

advise defendant of penalties during waiver colloquy was ***not*** a defect. *Id.* at 120 n.9. Looking at the record beyond the colloquy, the Court stated that the defendant had been sufficiently advised of the potential range of punishments at his initial appearance, bail hearing and arraignment. *Id.*

Similarly, in *Jones*, the Third Circuit held that the district court's "skipp[ing] of several important bases" in a *Faretta* colloquy, including failing to discuss range of punishment, resulted in an unknowing waiver and required a new trial. *Jones*, 452 F.3d at 230-233. In addressing the penalty issue specifically, the Court stated that it "reject[ed] the approach of some of our sister Circuits that allows examination of the record as a whole in an attempt to divine what the defendant understands about the consequences of proceeding *pro se*. *Id.* at 232. Nonetheless, recognizing that *McFadden* had "look[ed] beyond" the colloquy to determine whether a defendant understood the charges and sentence, the *Jones* Court examined the record:

> Even if we were inclined to look beyond the District Court's colloquy, we note that the record contains no evidence that Jones was ever directly informed of the punishment he faced. . . [T]he prosecutor's single mention of protentional punishment at a hearing more than a year before Jones expressed his desire to proceed *pro se* was insufficient, as a matter of law, to demonstrate he was aware of the magnitude of the punishment he faced."

*Id.* Thus, despite professing to reject the "whole record approach," *Jones* actually looked to the whole record in conducting its analysis.

More recently, in *Taylor*, the Third Circuit reviewed a district court's denial of a motion to proceed *pro se*. 21 F.4th at 101-02. Without conducting a full *Faretta* colloquy, the district court denied the *pro se* motion based on its concern that the defendant intended to advance a baseless "Sovereign

Citizen" defense at trial,. The Third Circuit reversed and remanded for a new trial explaining that it was error—in the absence of a defendant's obstruction or disruption of the proceedings—to deny a motion to proceed *pro se* without attempting to conduct a colloquy. *Id.* Explaining that at a minimum the colloquy must include the defendant's understanding of the nature of the charges, the statutory offenses and the "range of allowable punishments," the Court noted that "there could be a case where we approve of a district court's inquiry and its resulting conclusion even though the district court bypassed one or more of such subjects." *Id.* at 103 n.7.Thus, *Taylor* recognized that in certain case consideration of the entire record, and not just the colloquy, could be appropriate.

Additionally, this court can consider a defendant's motivations for waiving his right to counsel, if any, because seeking to proceed pro se to pursue a strategy is indicative of a knowing and intelligent waiver. "While the identification of the defendant's reasons for wishing to dismiss his current counsel is more pertinent when substitute counsel is desired, we have noted that his reasons may also inform the knowing, understanding, and voluntary [6th Amendment waiver] inquiry as well." *Peppers*, 302 F.3d at 132–33; *see also Stubbs*, 281 F.3d at 117 (noting that "the defendant's motives may shed light on whether the defendant's waiver has been made knowingly and intelligently"); *McFadden*, 630 F.2d at 972.

### IV.    The Court Must Deny Williams' Motion for a New Trial

Relying on *Booker*, Williams contends that he is entitled to a new trial under Rule 33 based solely on the misstatement of the Count 4 penalties during his *Faretta* colloquies. DE 296-1. Although like *Booker,* the present case involves a misstatement in potential penalties for the Count 4 offense, the error pales in comparison to the "significant" errors in *Booker*, which resulted in the defendant being uninformed about a potential 25-year consecutive mandatory minimum sentence. And the record makes crystal clear that Williams knew he could die in prison if convicted at trial.

### A.    Williams' *Faretta* Colloquies Alerted Him to the Range of Possible Penalties

Looking solely at this Court's *Faretta* colloquies, the Court should find that Williams' eyes were open to the potential range of penalties he faced such that he knowingly and intelligently waived his right to counsel. In contrast to *Booker*, this Court advised Williams that he faced a possibility of life imprisonment and a mandatory minimum of at least 15 years' imprisonment, albeit in connection with a ***different*** Count: Count 3. Specifically, the Court informed Williams that on Count 3 he faced a mandatory minimum term of 15 years' imprisonment, and that if he had two or more prior convictions for sex offenses against children, he could face up to life imprisonment. *See* DE58 at 19–21 (first *Faretta* colloquy); DE197, at 23–24 (second *Faretta* colloquy). Although Williams does not have any qualifying prior convictions, the Court gave him that advice in case he did by the time he was sentenced in this case. DE58, at 20–21 (first *Faretta* colloquy); DE197, at 23–24 (second *Faretta* colloquy).

21

Moreover, during each *Faretta* colloquy, the Court advised Williams that the terms of imprisonment he faced could run consecutively, not just to each other but also to any terms of imprisonment he received in his District of Connecticut and Eastern District of New York cases. *See* DE58, at 22, 26–27 (first *Faretta* colloquy); DE197, at 25, 29 (second *Faretta* colloquy). Thus, based on the court's *Faretta* colloquies, Williams must have understood that he faced a statutory aggregate maximum sentence of at least 120 years' imprisonment (30 + 30 + 30 + 10 + 20) if convicted on all five Counts in this case, separate and apart from any terms of imprisonment he received in his other cases. Williams, who was nearly 36 years of age for the first *Faretta* colloquy and 37 for the second, could not have expected that a 120-year term of imprisonment would mean anything less than spending the rest of his natural life in prison. *See, e.g., McCollister*, 535 F. App'x at 191-92 ( "[while] not informed that the maximum prison term could be life, this omission was inconsequential in view of McCollister's age at the time of the plea colloquy (39-years-old)" and the fact that McCollister was advised that he faced "an aggregate prison range of 40 to 80 years in prison").

Thus, on the face of the colloquies alone, Williams knew that he faced a range of punishments which included:

- a statutory mandatory minimum sentence of 15 years (albeit on Count 3);

- a potential maximum sentence of 120 years (which was effectively a life sentence for him); and

- a life sentence (again, on Count 3) if he had sufficient qualifying predicate convictions.

The similarity of the advised penalties on Count 3 (15 to 30 but potentially life) and the actual penalties on Count 4 (10 to life)—when coupled with the warning that all of the maximum sentences could run consecutively, which logically meant a 120 year statutory maximum sentence—show that based solely on this court's colloquies, Williams knew full well he could spend the rest of his life in prison if convicted, such that his waiver of his Sixth Amendment right to counsel was knowing and intelligent. Simply put, nothing like the "significant shortcomings" in the district court's discussion of penalties in *Booker* happened here.

### B. Beyond the Colloquies, the Record Shows that Williams Knew the Range of Possible Penalties

As discussed above, the Third Circuit also permits district courts to look beyond the confines of the *Faretta* colloquies in certain circumstances. For example, in *McFadden*, where the defendant had engaged dilatory tactics and gamesmanship, the Court of Appeals found a valid waiver after looking beyond the *Faretta* colloquy to other evidence showing he knew the range of penalties he faced. 630 F.2d at 972. Similarly, in *Stubbs,* although the colloquy was insufficient on numerous other bases, which ultimately rendered the defendant's waiver invalid, the Third Circuit—looking at the record beyond the colloquy—noted that the defendant had been properly advised of the charges and penalties on multiple occasions—including the defendant's initial appearance, bail hearing, and arraignment. *Id.; see also Moskovitz*, 86 F.3d at

1308-09 (affirming waiver with cap at the highest sentence defendant knew he could receive based upon the record).

This case is similar to *McFadden* and *Stubbs* in that other record evidence shows that Williams **knew** that he faced a possible life sentence prior to his trial here. For example, at page 23 of the transcript of his September 29, 2023 *Faretta* colloquy in the District of Connecticut (Exhibit 2), the court correctly advised Williams that, for his § 2422(b) count there, he faced a "mandatory minimum term of imprisonment of 10 years" and "a maximum of life." Importantly, the District of Connecticut's *Faretta* colloquy occurred between the two *Faretta* colloquies in this case. And in the District of Connecticut case, Williams also faces two counts of aggravated sexual abuse of a child less than 12 years old. During his *Faretta* colloquy there, Williams said that he faced "30 years to life in prison" for each count. Exhibit 2, at 13; *see id.* at 14 (advising Williams of those penalties). Thus, Williams **knew** he faced life imprisonment on three counts in that case (including one count akin to Count 4 here), and a mandatory minimum of 30 years' imprisonment for two of those counts. Yet he **still** decided to proceed *pro se* in that case. All of that helps show that the mistakes in describing the penalties for Count 4 here did not cause Williams to waive his right to counsel at trial. *See, e.g., Stubbs*, 281 F.3d at 120 n.9; *McFadden*, 630 F.2d at 972.

In addition, while cross-examining one of his victims, Williams complained repeatedly that he was "facing a life sentence." DE249, Trial Tr. at 1205; *see id.* ("I'm facing a life sentence . . . I'm facing life."); *id.* at 1208 ("Your Honor, I'm facing a life sentence, Your Honor. . . . I'm facing a life sentence, Your Honor. She has to tell the

truth, Your Honor."); *id.* at 1272 ("Your Honor, I'm facing a life sentence here. . . . I'm getting a life sentence. . . . I'm getting a life sentence and I didn't rape her."); *id.* at 1273 ("Your Honor, I'm facing a life sentence."). And later in the trial, Williams complained that he needed "to be able to confer with Mr. Catanzaro more than five minutes before 9:00" because "I'm facing a life sentence in this courtroom." DE250, Trial Tr. at 1526; *see id.* DE266, Trial Tr. at 2344 ("I'm facing life in prison"). Just like the defendant in *Small,* Williams "was fully aware, as documented in the record, that he could spend the rest of his natural days in prison if convicted. Not only did the judge say it to him, defendant said it himself. . . . Defendant knew the length of imprisonment he faced and was adamant that he wanted to represent himself." *Small,* 2023 WL 4362728, at *21.

### C.    Williams' Strategies and Motivations for Proceeding Pro Se Further Show That His Waiver Was Knowing and Intelligent

This court should also consider Williams' strategies and motivations for proceeding *pro se* in considering the validity of his waiver. Throughout this case, Williams has employed at least two strategies which he was able to effectuate only through his status as *pro se* defendant. *See, e.g., Peppers*, 302 F.3d at 132–33 (noting a defendant's reasons may inform the waiver inquiry); *Stubbs*, 281 F.3d at 117 ("defendant's motives may . . . shed light on whether the defendant's waiver has been made knowingly and intelligently"). First, Williams repeatedly used his *pro se* status to delay his trial, including by insisting on prolonged and inappropriate discovery reviews, which caused significant delay. *See. e.g.,* DE97. The record is replete with instances in which the court called out Williams' dilatory tactics. *See, e.g.,* March 11,

2024 Transcript, DE124 at 40-41 (referencing Williams' gamesmanship and intent to "delay, delay, delay"), 43-44; June 25, 2024 Transcript, DE197 at 15, 35-36. Indeed, during a discovery review session on June 27, 2023, Williams told agents since no one could beat this case, "why not drag it on as long as possible" in the hopes that he could get a better plea offer. *See* DE97 at 5, Exhibit A at 7. Knowing that it was impossible to win at trial with the mountain of evidence against him, Williams embraced delay as a tactic. Knowing that Mr. Catanzaro (or any other effective attorney) would not indulge in such a strategy, Williams had to be *pro se.*

In addition to delay, Williams wanted the opportunity to speak directly to the jury without having to testify—which likely would have allowed the Government to introduce the damning admissions he made during his proffers. DE176. Williams repeatedly attempted to tell ***his*** story through his opening statement and cross examination of witnesses, without regard for the Rules of Evidence, this court's prior rulings or the truth. Indeed, the first words out of his mouth during his opening statement were: "Your Honor and members of the jury, I'm defending myself *pro* se. I'm unprepared, not ready, and being forced into this trial. This Court is biased. . . . They have perverted justice to deny this defendant due process." Trial Tr., DE219 at 120, 127 ("The prosecution lied—they lied and used my conviction to religion to pull a deal that we had in place."). In this way, Williams was able to "testify" without subjecting himself to cross-examination and without the potential admission of his proffered statements.

Similarly, knowing that the court precluded the admission of evidence of other sexual conduct by the victim, Alyssa, DE175, Williams repeatedly violated the court's order, and made prohibited statements during his opening statement and his cross-examination of witnesses. For example, in his opening, Williams violated the court's order by stating:

- "Alyssa confided in me the fact that other people were harassing her for more pictures. . . In fact, the evidence will show at the time messages of sexually explicit conduct is taking place with other men/boys." DE219 at 124;

- "Not only was Alyssa being harassed . . I was told by Alyssa people were threatening her with her nudes. For example, one time she was intoxicated and sent a picture to a guy who did attempt . . .to extort her for more pictures." DE219 at 126.

He continued this conduct during his cross-examination of Alyssa, asking her about alleged nude photographs that she sent to other guys, Trial Tr., DE249 at 1231-32. In addition, he attempted to harass and bully Alyssa while she was on the stand by yelling at her to tell the truth because "I'm facing a life sentence here," DE249 at1205, and asking her numerous inappropriate and irrelevant questions such as:

- their sexual positions when they had intercourse, DE249 at 1219;

- whether she told him to "fuck me, harder, fuck me, harder," and that having sex with him was "the best experience" of her life; DE249 at 1919 & 1240-41; and

27

- asking about Alyssa's family situation "So your mom is not your biological mother, right? . . . Where is your real mom, at?" DE249 at 1276.

Williams knew that no attorney would flout the court's orders or engage in such reprehensible treatment of a then 16-year-old victim, but as a *pro se* defendant he could do so. And he did.

Finally, Williams used his *pro se* platform to seek sympathy from the jurors by repeatedly announcing he was facing a life sentence, and by drawing their attention to his shackles. No attorney would have done so. Because Williams was only able to effectuate his strategies by representing himself *pro se*, the court may and should consider Williams' trial strategies in determining that his Sixth Amendment waivers were knowing and intelligent.

Accordingly, the Court should deny Williams' motion for a new trial.

Respectfully Submitted,

VIKAS KHANNA
Acting United States Attorney


_____
DIANA VONDRA CARRIG
PATRICK C. ASKIN
Assistant U.S. Attorneys
United States Attorney's Office
District of New Jersey

Dated: February 27, 2025

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on this day I caused to be served, via the Court's Electronic Filing System and via email, a copy of the Government's Memorandum of Law in Opposition to Defendant's Motion for a New Trial Under Rule 33 on Mark W. Catanzaro, Esquire, counsel for Zachary Williams.

Respectfully Submitted,

VIKAS KHANNA
Acting United States Attorney

_____
DIANA VONDRA CARRIG
PATRICK C. ASKIN
Assistant U.S. Attorneys
United States Attorney's Office
District of New Jersey

Date: February 27, 2025